IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
:
In re: : Chapter 11
:
IMRIS, Inc., *et al.*,[1] : Case No. 15-11133 (_____)
:
: (Joint Administration Pending)
Debtors. :
:
---------------------------------------------------------------x

**DECLARATION OF JAY D. MILLER
IN SUPPORT OF FIRST DAY PLEADINGS**

1. I am the President and Chief Executive Officer of IMRIS Inc. ("IMRIS Canada"), and its direct subsidiary IMRIS, Inc. ("IMRIS US"), and am an officer of NeuroArm Surgical Ltd. ("NASL", and collectively with IMRIS Canada and IMRIS US, the "Debtors"). I am also a member of the Board of Directors of both IMRIS Canada and IMRIS US. Further, I am an officer of certain other affiliated and related companies (collectively with the Debtors, "IMRIS" or the "Company"). An organizational chart of the IMRIS entities is attached hereto as Exhibit A.

2. I joined the Debtors in 2012, and since that time have been responsible for the operation of IMRIS' business globally, including sales, marketing, research and development, operations, customer service, regulatory affairs and quality. I have extensive technical and managerial experience in the medical device industry. Prior to joining IMRIS, I was the President and Chief Executive Officer of Zonare Medical Systems, President and Chief Executive Officer, of Vital Images Inc., and held senior roles at both GE Healthcare and Siemens Healthcare. I have

---

[1] The Debtors are the following three entities: IMRIS Inc. (Canadian corporation number 434265-8), IMRIS, Inc. (taxpayer identification number 98-0462325) and NeuroArm Surgical Ltd. (Canadian corporation number 751695-9). The mailing address of each of the Debtors, solely for purposes of notices and communications, is 5101 Shady Oak Rd., Minnetonka, MN 55343.

a B.A. in Chemistry from Dartmouth College, a Masters in Biomedical Engineering from the University of Virginia, and a Masters in Business Administration from the Kellogg School of Management, Northwestern University.

3.     On the date hereof (the "Petition Date"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), as well as certain motions and other pleadings (the "First Day Pleadings"). I am authorized by the Debtors to submit this Declaration on their behalf in support of the First Day Pleadings.

4.     The First Day Pleadings are intended to enable the Debtors to operate effectively and efficiently during these chapter 11 cases, as well as avoid certain adverse consequences that might otherwise result from the commencement of such cases. Among other things, the First Day Pleadings seek relief aimed at maintaining the confidence of the Debtors' various stakeholders, vendors and employees to preserve value that would otherwise quickly erode. Gaining and retaining the support of these key constituencies is critical to the Debtors' efforts to stabilize their business operations and maximize value for the benefit of their Creditors. I have reviewed the First Day Pleadings, and it is my belief that the relief sought therein is necessary to: (a) avoid immediate and irreparable harm to, and ensure the uninterrupted operation of, the Debtors' business; and (b) maximize and preserve the value of the Debtors' chapter 11 estates.

5.     In my capacity as President, Chief Executive Officer and Director of certain of the Debtors, I am familiar with the Debtors' day-to-day operations, financial condition, business affairs and books and records. Except as otherwise indicated, all facts set forth in this Declaration are based upon (a) my personal knowledge, (b) my review of relevant documents, (c) information supplied to me by other members of the Debtors' management team or professionals retained by

the Debtors, or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If called upon, I could and would testify competently to the facts set forth herein.

6. Part I of this Declaration provides an overview of the Debtors' business. Part II provides a description of the Debtors' current debt obligations. Part III provides a discussion of the events that compelled the commencement of these chapter 11 cases, as well as the Debtors' plan for these cases. Part IV affirms and incorporates the facts that support the relief requested in the First Day Pleadings.

**Part I
Overview of the Debtors' Business**

History and General Background

7. IMRIS Canada was incorporated under the *Canada Business Corporations Act* on May 18, 2005. On May 20, 2005, IMRIS Canada acquired all of the assets and assumed all of the liabilities of Innovative Magnetic Resonance Imaging Systems Inc., ("Innovative"), and subsequently merged Innovative into IMRIS Canada. On June 15, 2005, IMRIS US was incorporated as a Delaware corporation. IMRIS currently trades on the Toronto Stock Exchange under the symbol "IM" and on the NASDAQ Global Markets Exchange under "IMRS". On February 5, 2010, IMRIS Canada acquired 100% of the shares of debtor NASL.

8. The Debtors' corporate headquarters are currently located in Minnetonka, Minnesota, after relocating there in late 2013 from Winnipeg, Canada. The Debtors employ approximately 90 full-time employees, comprising the Debtors' sales and marketing, customer support and operations, research and development and administrative functions, the substantial majority of which work from the Minnetonka, Minnesota headquarters. In addition, the Debtors'

officers and directors manage the Debtors' business from the Minnetonka, Minnesota location, and the Debtors' books and records are located there.

9. The Debtors and their related and affiliated companies throughout the world design, manufacture and market image guided therapy systems that enhance the effectiveness of therapy delivery, which include multiple field strength Magnetic Resonance systems, X-Ray Fluoroscopy systems, and Computed Tomography (CT) systems. All of these imaging capabilities are marketed by the Debtors as the VISIUS Surgical Theatre™. Our image guided therapy systems are a combination of real time visualization products and therapy delivery products that are designed to improve patient outcomes and reduce the cost of patient care (the "Imaging Business"). The Debtors accomplish this by combining their visualization technology products with therapy delivery products in a single integrated system that has the ability to provide timely information to clinicians to properly assess the treatment plan at the point of therapy delivery. The Debtors believe this approach to patient care not only improves patient outcomes, but also contributes to reduced cost of care for those patients. The Debtors' goal is to continuously deliver products that improve therapy delivery for an increasing number of medical procedures while, at the same time, are supported by peer reviewed published measurement of improved outcomes and reduced cost of care.

10. When the Company was formed in 2005, its initial focus was on gaining market acceptance for VISIUS Surgical Theatres in the neurosurgical market, securing early technology adopters to ensure the successful delivery of each customer installation as it developed the core competencies across all facets of the organization. As a result, the VISIUS Surgical Theatre has become the solution of choice for neurosurgery and is installed in leading neuroscience centers around the world. In addition, the Company's portfolio of products includes service and

4

extended maintenance contracts, accessories and disposables relating to the Company's installations (the "Service Business").

11. The Company's goal is to design visualization products that have the ability to be used in a large number of surgical and interventional procedures and to become a foundational investment in every hospital. To do this the system must be flexible enough to meet current and evolving procedural requirements while at the same time improving patient care and reducing costs to the hospital. The VISIUS Surgical Theatre can incorporate multiple configurations and imaging modalities while reducing patient risk and delivering real-time information to clinicians while preserving optimal surgical access and techniques.

12. Historically, the Company's products have enabled therapy delivery through traditional surgical techniques, primarily for neurosurgical applications. The Debtors believe that the VISIUS Surgical Theatre, in combination with therapy delivery, has the ability to continue to expand across a large number of clinical procedures. As the Debtors continue to work with clinicians to promote and identify potential new areas of clinical application, new high value procedures are expected, resulting in increased utilization and further adoption of the products.

13. We believe that the combination of the VISIUS Surgical Theatre with therapy delivery benefits patients, clinicians and hospitals:

**Patients:**

*Improved Outcomes:* Peer reviewed published research has shown significant improvements in patient outcomes when the intraoperative imaging available in the VISIUS Surgical Theatre is used in a procedure.

*Risk Reduction*: The risk of requiring a repeat operation because of incomplete procedures is significantly reduced due to improved levels of complete resection in the case of brain tumors as a result of the intraoperative visualization.

**Clinicians:**

*Enhanced Efficiency and Effectiveness:* High resolution imaging information is captured rapidly and presented in a manner designed to enhance clinician efficiency and effectiveness.

*Enhanced Workflow*: The patient can be maintained in the optimal surgical position throughout the procedure and the MRI or CT imaging system is removed from the surgical or interventional theatre when not required resulting in unrestricted access to the patient by the surgical team.

**Hospitals:**

*Greater Utilization of the VISIUS Surgical Theatre:* The VISIUS Surgical Theatre permits greater utilization of the imaging equipment as the MR or CT scanner can be shared by multiple operating rooms and a diagnostic imaging suite allowing for a single asset to be used by numerous clinicians.

*Increased Patient Volumes*: Improved patient outcomes may result in higher patient volumes and revenue for hospitals.

*Technology Attracts Clinicians*: Access to technologies such as the VISIUS Surgical Theatre can assist in both the recruitment and retention of clinicians.

14. In 2010, IMRIS expanded its business beyond the imaging and service business platforms when the Company acquired NASL and all of its intellectual property. Since then, the Company has been developing the SYMBIS Surgical System™, a surgeon-controlled surgical robot designed to enable minimally invasive procedures with more precise placement of instruments that are currently performed in a more invasive manner (the "Robotics Business"). This system consists of MR compatible robot arms and a surgical control console integrated together in the VISIUS Surgical Theatre. The Company believes that the combination of real-time high definition 3D visualization and MR or CT imaging integrated with a surgical robot may have the ability to transform a number of surgical procedures to minimally invasive procedures. The SYMBIS Surgical System is expected to have all of the traditional attributes of a robotic system such as accuracy, repeatability and control, along with haptic feedback to the

clinician.  The SYMBIS Surgical System is designed to be installed in both existing VISIUS Surgical Theatre systems, and in new installations.

15. The purchase and installation of a VISIUS Surgical Theatre represents a significant capital project for the Company's customers. The cost of an integrated VISIUS Surgical Theatre to a hospital can range from approximately $1.5 million to $12 million depending on the product selected, the room configuration and the level of integration services requested.  The installation generally involves additional capital expenditures by the customer for room construction and ancillary operating room equipment.  In addition to the initial installation costs, most of our customers also enter into long-term service contracts with the Company for maintenance and support of their VISIUS Surgical Theatre.  The Company does not provide leasing, deferred payment, profit sharing or other financing arrangements to our customers in connection with the purchase of our systems.

16. The Company's sales process requires that it engage with a number of different stakeholders within and outside the hospital to assist in making a strong clinical and business case for the VISIUS Surgical Theatre.  While neurosurgeons are generally the lead stakeholders of the hospital responsible for supporting a VISIUS Surgical Theatre acquisition, the sales process requires the involvement of radiologists, facilities managers, architects, hospital administrators and other hospital staff at various stages.  In certain cases, the Company also engage (as needed) with hospital funding sources, including private donors, government entities and financial institutions.  As a result, the Company's sales cycle is both complex and lengthy, typically lasting more than 12 months from initial customer engagement to receipt of a purchase order.

EAST\100511335.4

17. The Company also has distribution agreements in place with medical equipment distributors to address emerging market opportunities in Southeast Asia, India, the Middle East and Korea. In support of the Company's sales staff, the Company has regional market managers who are responsible for the development and delivery of territory specific marketing programs to create awareness and generate sales interest. Also supporting sales are specialists in program management, customer engineering, customer support and training who serve all of the sales regions. The Company's product marketing group is responsible for working with the sales staff, regional market managers and customers to identify potential new products and upgrades to be developed in conjunction with the Debtors' research and development group.

18. As of December 31, 2014, the Company had 52 patents either issued or pending on various aspects of the Company's technology.

19. A significant aspect of the Company's business operations relate to obtaining appropriate governmental approvals for the Company's range of product offerings. In the United States, medical devices are regulated primarily by the U.S. Food and Drug Administration ("FDA"). The FDA classifies medical devices into one of three regulatory classes, referred to as Class I, Class II or Class III, depending on the level of control and review necessary to ensure the safety and effectiveness of the device, which in turn is based on the level of risk to the patient. As the risk level increases, additional data is required to demonstrate the safety and effectiveness of the device. The products the Company currently markets are Class I and Class II medical devices There are two principal approval processes to begin the marketing of medical devices in the United States: (i) a pre-market notification, commonly referred to as "510(k) notification" and (ii) submission and approval of a pre-market approval application, commonly referred to as a "PMA." Many of the Company's key products have received 501(k) clearance from the FDA, while other

8

Company submissions are currently pending. In addition, a number of the Company's products have received similar approvals in Canada and Europe.

### Part II
### Debtors' Obligations

20. On September 16, 2013, each of the Debtors entered into a Secured Loan Facility (as subsequently amended, modified and supplemented from time to time, the "Facility Agreement"), with Deerfield Management Company, L.P. ("Deerfield"), which provided net proceeds of $24.5 million to the Company. The Facility Agreement matures five years from the date of the Facility Agreement and may be prepaid subject to certain restrictions. The principal amount of the loan was payable in three equal annual installments on the third, fourth and fifth anniversaries of the date of the disbursement, except that, if IMRIS achieved certain revenue targets, the principal payment due on the third anniversary could be deferred for up to two years and the payment due on the fourth anniversary could be deferred for one year. The outstanding principal amount of the loan accrued interest at a rate of 9 percent per annum. In connection with the entry into the Facility Agreement, Deerfield received warrants to purchase 6.1 million shares of IMRIS' common stock at an exercise price of $1.94 per share.

21. Among the covenants contained in the Facility Agreement was the requirement that the Company maintain cash and cash equivalents in excess of $7.5 million on the end of each calendar quarter. With the increasing pressures on the business (as further described below), the Company was unable to meet this covenant, and subsequently entered into Waiver and Forbearance Agreements with Deerfield on both September 23, 2014 and December 24, 2014, extending the date of covenant compliance. In exchange for these agreements, the Company reduced the exercise price of the warrants to $0.70 and then to $0.35386 per share.

22. With the Company's performance continuing to deteriorate, on March 31, 2015, the Company negotiated an amended Facility Agreement with Deerfield. The Amended Facility Agreement includes a revolving loan of up to (a) $0.6 million additional availability and (b) if requested by the Company, an amount equal to 50 percent of any additional cash received from the equity financing and rights offering, provided that the sum of (a) and (b) shall not exceed $3.0 million. The revolving loan bears an interest rate of 15 percent and matures March 31, 2016. Additionally, interest payments due in April 2015 and July 2015 pursuant to the Company's Facility Agreement are due instead in cash on October 15, 2015. The minimum cash balance requirement covenant was also waived for September 30, 2015 and December 31, 2015. In addition, the Company agreed to commence a sale process for all or parts of its business operations.

23. In addition to the obligations under the Facility Agreement, the Company also has an outstanding loan in the amount of $500,000 to the City of Minnetonka in relation to the relocation of the Company's headquarters. As of the Petition Date, the Debtors estimate they have outstanding unsecured obligations of $11.3 million, exclusive of intercompany obligations, which amount to approximately $17.7 million.

**Part III**
**Events Leading to the Commencement of**
**These Cases and the Debtors' Chapter 11 Plans and Strategies**

24. As with many medical device companies, IMRIS has had numerous hurdles to achieving financial success, which are often not necessarily linked to the enormous benefits derived from its cutting-edge technology. First, IMRIS has historically incurred significant fixed operating costs allocated to research and development of new technologies. These investments often require large capital commitments over long development timeframes. While the Company has had some ability to eliminate or delay certain costs, delaying or halting these

10

activities would have dramatically impacted the completion and commercialization of new products, further limiting the Company's ability to grow the business.

25. In addition, the significant capital expenditures required by the Company's customers to purchase and install a VISIUS Surgical Theatre has created enormous variability in the Company's economic performance. Due to the size and complexity of these projects, the Company's sales process requires that it engage with a number of different stakeholders within and outside the hospital, including surgeons, radiologists, anesthesiologists, facilities managers, hospital administrators and other hospital staff. As a result, the sales cycle associated with the marketing of our VISIUS Surgical Theatres is both complex and lengthy, with an average sales cycle of more than 12 months from initial customer engagement to receipt of a purchase order. Further, once a hospital purchases a VISIUS Surgical Theatre, the time for manufacture, delivery and installation of the product may exceed 12 months, which delays the Company's ability to recognize revenue. In addition, because payment of a substantial portion of the purchase price for our products is not due from the customer until the system has been delivered, installed and accepted by the customers, delays in manufacturing, delivering and installing a completed system, as well as customer construction delays, may have a negative effect on the Company's cash flow.

26. Moreover, the imaging medical device industry is heavily competitive, with the Company's competitors being large medical systems suppliers that have considerably greater resources at their disposal than the Company does in terms of technology, manufacturing, product development, marketing, distribution, sales, commercialization, capital resources and human resources, with established relationships with hospitals. The Company's competitors also generally have more experience in obtaining domestic and foreign regulatory approvals.

11

27. A combination of all of these factors have led to mounting losses for the Company. Total revenue in 2014 compared with 2013 decreased by $17.2 million or 37.3 percent to $28.9 million. Lower new order bookings in early 2013 resulted in lower backlog during 2013, particularly in new systems orders, which in turn resulted in lower revenues in 2014 due to the long delivery and installation cycles for the VISIUS Surgical Theatres, in part due to customer construction delays. Service revenue in 2014, including revenue from extended maintenance contracts, increased $1.7 million from 2013 primarily as a result of a larger install base of clinical VISIUS Surgical Theatres which have transitioned to chargeable service programs.

28. A combination of mounting losses, extensive capital expenditures and delayed new product sales has resulted in severely constrained liquidity, which has significantly affected the Company's liquidity and ability to pay its debts as they become due.

29. Prior to filing these chapter 11 cases, the Company engaged Imperial Capital ("Imperial") to explore a broad range of strategic financing and sale options for the Company and its various business units. Initially, Imperial focused its efforts on raising additional equity for the Company, either through a PIPE transaction or through a rights offering. In addition, Imperial was directed to explore the sale of the Company, either in its entirety as a going-concern or in parts, focusing on (i) the Imaging Business, (ii) Service Business and (iii) Robotics Business platforms. In all, Imperial approached 39 financial and strategy buyers for the Company's assets. As this process unfolded, however, it became clear that owing to liquidity constraints, the Company could not effectuate a sale of its business, in whole or in part, outside of chapter 11.

30. After careful evaluation and further negotiation with the Company's stakeholders, including Deerfield, it was determined that the structure and financial support through securing debtor- in-possession financing provided by Deerfield, as well as Deerfield's

12

ability to consummate a transaction within the limited time available for at least certain of the Company's assets, presented the best option for the Company. The Debtors believe that the Company's assets have been thoroughly marketed by Imperial and that an expedited sale of their business is essential to not only preserving the underlying value of their operations by providing customers and employees with a clear path forward, but in satisfying the Company's obligations to its creditors.

**Part IV**
**Facts Relevant to the First Day Pleadings**

31. Concurrently with the filing of these chapter 11 cases, the Debtors filed the First Day Pleadings, which request various forms of relief. Generally, the First Day Pleadings have been designed to meet the Debtors' goals of: (a) continuing their operations in chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of their employees, vendors, suppliers and service providers during the Debtors' reorganization process; (c) establishing procedures for the smooth and efficient administration of these chapter 11 cases; (d) obtaining debtor-in-possession financing and (e) working toward a prompt sale of their assets.

32. I have reviewed and discussed with Debtors' counsel each of the First Day Pleadings filed contemporaneously herewith (including the exhibits thereto and supporting memoranda) and incorporate by reference the factual statements set forth in the First Day Pleadings. It is my belief that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve a successful going-concern sale of their assets.

33. It is my further belief that, with respect to those First Day Pleadings requesting the approval of debtor-in-possession financing from Deerfield (the "DIP Motion"), the relief

13

requested is essential for the Debtors to sustain their operations and, similarly, for the IMRIS's other entities in Europe and Asia to obtain the liquidity necessary to continue their operations. As noted above, the Debtors and non-debtor affiliates have been unable to obtain additional liquidity, and as a result, their liquidity position is dangerously low.  In fact, as of the Petition Date, the Debtors in the aggregate have less than $100,000 in available cash.  Absent the ability to obtain additional liquidity through the financing contemplated in the DIP Motion, it is unlikely that the Debtors would have the liquidity to operate, thus likely leading to a liquidation of these businesses.  Owing to the highly leveraged nature of the Company's business operations, it would have been virtually impossible to find a party other than Deerfield willing to provide incremental financing to the Company.

34. The Debtors request the joint administration of these chapter 11 cases, which will permit the Clerk of the Court to utilize a single general docket for these cases and combine notices to creditors of the Debtors' respective estates and other parties in interest.  Entering an order directing joint administration of the Debtors' chapter 11 cases will avoid the need for duplicative notices, motions and applications, thereby saving time and expense for the Debtors and easing the administrative burden for the Court and the parties.  Joint administration will also enable parties in interest in each of the above-captioned chapter 11 cases to be apprised of the various matters before the Court in each of these cases.

35. Following the filing of the chapter 11 cases, the IMRIS Canada and NASL (together, the "Canadian Debtors") intend to commence an Ancillary Proceeding (the "Ancillary Proceeding") under Part IV of the Companies' Creditors Arrangement Act (the "CCAA") in the Manitoba Court of Queen's Bench.  IMRIS US, as the proposed foreign representative for the

14

Canadian Debtors in the Ancillary Proceeding, intends to seek recognition of these chapter 11 cases and certain orders entered in these chapter 11 cases.

36. In connection with the Ancillary Proceeding, the appointment of an information officer (the "Information Officer") is standard practice. The Information Officer serves as an independent party to the Ancillary Proceeding by relaying information between the Canadian Debtors and the court. By way of example, the Information Officer:

(a) reports to the court at least once every three months with respect to the status of the CCAA proceedings and the status of the chapter 11 cases, which reports may include information relating to the Debtors' property, the business, or such other matters as may be relevant to the proceedings;

(b) obtains full and complete access to the Debtors' property, including the premises, books, records, data, including data in electronic form, and other financial documents of the Debtors, to the extent that is necessary to perform its duties; and

(c) shall be at liberty to engage independent legal counsel or such other persons as the Information Officer deems necessary or advisable respecting the exercise of its powers and performance of its obligations.

37. The Canadian Debtors intend to seek the appointment of FTI Consulting Canada Inc. as Information Officer.

38. The Debtors believe that if the Canadian Court decides to recognize the chapter 11 cases as foreign main proceedings, the Debtors will benefit from the protection of an automatic stay against commencement or continuation of actions or proceedings concerning the Debtors' assets, rights, obligations and liabilities in Canada.

39. With respect to the Debtors' request for approval of bid procedures relating to the sale of their assets (the "Bid Procedures Motion"), the approval of this motion as quickly as practicable is essential for the continued viability Debtors' businesses. As noted above, Imperial has engaged in a fulsome pre-petition marketing process for the Debtors' assets. As a result of these efforts, Deerfield provided the highest and otherwise best proposal to purchase the

Debtors' assets. Nonetheless, Imperial has continued to market these assets to determine if an alternative buyer is willing to purchase these assets, and will do so during the contemplated marketing process. The entry of the Bid Procedures Order will provide far greater certainty to the Company's customers, vendors and employees regarding the future of the Company and its assets.

40. Finally, in regard to authority to pay discrete prepetition claims or continue selected prepetition programs (e.g., those First Day Pleadings seeking relief related to the Debtors' obligations to their employees), the relief requested is essential to the Debtors' reorganization and necessary to avoid immediate and irreparable harm to the Debtors' employees. Impairment of the Debtors' business operations, or of their relationships with their employees or the Debtors' other vendors — at the very time when the smooth operation of those operations and the dedication, confidence and cooperation of those constituencies is most critical — would clearly imperil the Debtors' chance to preserve the underlying value of their business and provide a recovery to their creditors. The Debtors operate in an extremely competitive industry and any diminution in the Debtors' ability to maintain their operations in the ordinary course will have an immediate and irreparable harmful impact upon the value of the Debtors' estates to the detriment of all of the Debtors' creditor constituencies. The Debtors believe that payment of those selected prepetition claims identified in the First Day Pleadings will forestall irreparable harm and that all creditors of the Debtors will ultimately benefit from the relief requested therein.

[*Signature Page to Follow*.]

Dated: May 25, 2015
       Minneapolis, MN

_____
Jay D. Miller

**EXHIBIT A**

**(Organizational Chart)**



*The shaded boxes represent each of the Debtor entities.

EAST\100762755.1